Mark G. Worischeck/Bar No. 011147
Ryan P. Sandstrom/Bar No. 029862
**SANDERS & PARKS, P.C.**
3030 North Third Street, Suite 1300
Phoenix, AZ 85012-3099
Phone: 602.532.5795
Mark.Worischeck@sandersparks.com
Ryan.Sandstrom@sandersparks.com

Michael G. McQuillen/IL Bar No. 6188166
(*admitted pro hac vice*)
Christopher J. Raistrick/IL Bar No. 6237922
(*admitted pro hac vice*)
Mark S. Susina/IL Bar No. 6201998
(*admitted pro hac vice*)
Richard C. Harris/IL Bar No. 6313005
(*admitted pro hac vice*)
**ADLER MURPHY & McQUILLEN, LLP**
20 S. Clark St., Suite 2500
Chicago, Illinois 60603
Phone: 312.345-0700
mmcquillen@amm-law.com
craistrick@amm-law.com
msusina@amm-law.com
rharris@amm-law.com

*Attorneys for Defendant L3Harris Technologies, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Gibson Muir, a natural man living in Tempe, Arizona,<br><br>                    Plaintiff,<br><br>v.<br><br>L3Harris Technologies, Inc., a Delaware for-profit corporation,<br><br>                    Defendant. | Case No. 2:19-cv-05887-DGC<br><br>**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT** |

Defendant, L3HARRIS TECHNOLOGIES, INC. ("L3"), hereby moves to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and in support submits this incorporated Memorandum of Law.

**Certification of Conferral**

Pursuant to this Court's Order, dated December 27, 2019 (Doc. No. 8), the undersigned counsel hereby certifies that the parties have conferred to determine whether an amendment could cure Plaintiff's deficient pleading, and have been unable to agree that the pleading is curable by permissible amendment.

## I. INTRODUCTION

On December 2, 2019, Plaintiff filed his *pro se* Complaint in the Superior Court of Arizona in Maricopa County in case number CV2019-013495. On December 23, 2019, L3 filed a notice of removal to this Court. In his *pro se* Complaint, Plaintiff alleges that L3 violated state and federal law when it developed certain proprietary airport passenger screening technology for use by the Transportation Security Administration ("TSA"). Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when it fails to state a claim upon which relief may be granted. Plaintiff's complaint should be dismissed under Rule 12(b)(6) because neither the facts pled, nor any facts that may be pled, can state any claim against L3 for which relief may be granted.

## II. PLAINTIFF'S ALLEGATIONS

Plaintiff alleges he was travelling through Phoenix-Mesa Gateway Airport on August 9, 2018, when he was subjected to an unlawful security screening process. His supporting allegations rest on his contention that L3's "Provision millimeter wave scanner" utilized technology capable of detecting objects beneath the skin. *See* Plaintiff's *pro se* Complaint, Doc. No. 1-3, at ¶¶ 6, 16. According to Plaintiff, airport passenger screening technology "is limited, by Congress, to the surface of the skin and objects on the body." *Id.* at ¶ 21. Thus, Plaintiff alleges, L3 violated his rights when it developed technology capable of revealing his "human tissue information beneath the skin." *Id.*

Plaintiff alleges that L3's "unlawful" technology displayed a "false threat alarm" on the

surface of his skin near his right groin. This led to a physical pat-down to resolve. Plaintiff alleges that the "false threat alarm" was really an "underneath the skin congenital disability" which he "rightfully expected to keep private." *Id.* at ¶¶ 14-16. Plaintiff claims he was injured when L3 "instigated creation of 'The Shadow,' a menacing presence now constantly inhabiting [his] waking psyche." He further alleges that L3 "violated [his] private relationship with the Creator by unlawfully disclosing his private disability/emergency." *Id.* at ¶¶ 42-43. He identifies several causes of action, including, *inter alia*, intrusion upon seclusion, false imprisonment, and intentional infliction of emotional distress. *Id.* at ¶¶ 30-41. He seeks $250,000,000 in damages, along with injunctive relief seeking the return of his "scan code." *Id.* at ¶¶ 48-49.

Plaintiff acknowledges that L3's technology is "sold commercially" and "used in a civilian setting by [the] Transportation Security Administration" ("TSA"). *Id.* at ¶ 12. He nonetheless claims that L3's conduct was "the direct cause of his damages," which "could not have happened without L3's reckless and unlawful actions." *Id.* at ¶ 15. Plaintiff also acknowledges that L3 "is a United States government contractor," and that "L3's Provision millimeter wave scanner was in use at [Phoenix-Mesa Gateway Airport] under U.S. government contract on August 9, 2018." *Id.* at ¶ 6.

**III.   THE SAFETY ACT**

The Department of Homeland Security ("DHS") has determined that L3's disputed technology qualifies for protections under the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 ("SAFETY Act") (6 U.S.C. § 441 *et seq.* (2018)). Congress passed the SAFETY Act in recognition of the vital role played by technology in defending against terrorist threats. Alison M. Levin, *The Safety Act of 2003: Implications for the Government Contractor Defense*, 34 PUB. CONT. L.J. 175, 176 (2004). Congress further recognized that the "Nation's product liability system threatens to keep important new technologies from the market where they could protect our citizens." *Id.* (quoting the House Select Committee on Homeland Security, H.R. REP. NO. 107-609, at 118 (2002)). Accordingly, Congress enacted a set of liability reforms to ensure that manufacturers would not be deterred from developing critical anti-terrorism

technologies. *Id*.

To become eligible for the "system of risk management" established by the SAFETY Act, the manufacturer (or "Seller") of anti-terrorism technology must first submit a "SAFETY Act Application Kit." 6 U.S.C. § 441(b) (2018); 6 CFR §§ 25.2, 25.6 (2018). There are broad non-disclosure protections for the materials submitted to DHS during the application process—all such materials are deemed "SAFETY Act Confidential Information." 6 CFR §§ 25.2, 25.10 (2018). The liability protections available under the SAFETY Act are then triggered if the Under Secretary for Science and Technology of the DHS certifies and designates the "Qualifying Anti-Terrorism Technology" ("QATT"). 6 U.S.C. § 441(b) (2018); 6 CFR § 25.3 (2018).

As a result of L3's SAFETY Act Application, the DHS awarded both Certification and Designation under the SAFETY Act to L3 for its Provision™ ATD and Provision™ 2 products, the products targeted by Plaintiff in this matter. The SAFETY Act Certification and Designation for L3's QATT is attached hereto as **Group Exhibit 1**. At the time of the Certification and Designation (October 26, 2016), L3 was known as L-3 Communications Corporation. The Certification and Designation both include the same exhibit (Exhibit A) describing the intended function of L3's QATT. The exhibit states that the QATT is "a security portal that uses millimeter-wave scanning technology to produce three-dimensional images of subjects to detect threat objects, if present, on scanned subjects." More specifically, the QATT utilizes software that "analyzes scanned data and highlights threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation."

Attached hereto as **Exhibit 2** is a Declaration from Matt Weingast, L3's Vice President and General Counsel, stating that: (1) L3 Harris Technologies, Inc. (L3) is the corporate successor of L-3 Communications Corporation; (2) the SAFETY Act Certification and Designation attached as Group Exhibit 1 are true and accurate copies of the authentic documents provided by the DHS Deputy Under Secretary for Science and Technology; (3) L3's Provision™ ATD and Provision™ 2 are the only models of "Provision millimeter wave scanners" that L3 has sold to the TSA for airport passenger security screening at the Phoenix-Mesa Gateway Airport, and (4) at no point did

L3 exercise any degree of control or authority over the QATT after it was sold to the TSA.

## IV. **APPLICABLE LEGAL STANDARDS**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient factual allegations to state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It is not enough for a plaintiff to allege a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. And while a court must generally accept a plaintiff's factual allegations as true, a court does not accept as true a plaintiff's legal conclusions that are merely couched as factual allegations. *Id*. In determining whether a complaint states plausible claim for relief, a court must draw on its own judicial experience and common sense. *Id*. at 679.

Aside from considering the sufficiency of a plaintiff's factual allegations, a court considering a Rule 12(b)(6) motion must also consider any documents incorporated into the complaint by reference and other matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Further, a court may dismiss a claim under Rule 12(b)(6) based on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989); *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015).

## V. **ARGUMENT**

Plaintiff's Complaint must be dismissed for at least four reasons. First, L3 is entitled a rebuttable presumption under the SAFETY Act that the Government Contractor Defense applies and unless rebutted, L3 is entitled to immunity as a Government Contractor under the SAFETY Act. Second, in the event the Court determines that L3 is not entitled to government-contractor immunity, Plaintiff's Complaint should be dismissed based on a dispositive issue of law, because it rests on the false legal premise that Congress has prohibited the TSA from using airport passenger screening technology capable of viewing objects beneath the surface of the skin. *See Seismic Reservoir 2020*, 785 F.3d at 335 (dismissing a claim under Rule 12(b)(6) based on the lack of an available remedy). Third, even if the Court disagrees with L3's first two arguments, Plaintiff's Complaint must still be dismissed because it is riddled with legal conclusions that are

improperly couched as factual allegations. The few factual allegations he does make are inconsistent with his acknowledgment that L3's technology is "sold commercially" and "used in a civilian setting" by the TSA. *Id*. at ¶ 12. And lastly, because it is undisputed that the TSA was in possession of L3's allegedly unlawful technology and used said technology to conduct the allegedly unlawful security screening, Plaintiff has no basis to claim that L3 intentionally caused him any harm. If anyone intentionally harmed Plaintiff, which L3 denies, it was the TSA, over which defendant has no control.

### 1. L3 is Entitled to Immunity as a Government Contractor

Plaintiff acknowledges that L3 "is a United States government contractor" and that "L3's Provision millimeter wave scanner was in use at IWA under U.S. government contract on August 9, 2018." Complaint at ¶ 6. He further concedes that the "Procurement and operation of TSA checkpoint equipment is a uniquely federal interest." *Id*. at ¶ 7. He claims that L3 cannot assert judicially created government contractor defenses under "*Yearsley*" or "*Boyle*"[1] (*Id*. at ¶¶ 8, 10), but he overlooks the government contractor defense codified by Congress in the SAFETY Act.

The SAFETY Act codified a rebuttable presumption that the government contractor defense may be asserted by a "Seller" of QATT. This rebuttable presumption applies against product liability lawsuits "arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies approved by the Secretary … have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller." 6 U.S.C. § 442(d)(1) (2018).

To establish the rebuttable presumption of the government-contractor defense, the Seller of QATT must produce a Certification of a Technology as an Approved Product for Homeland Security. 6 CFR § 25.8 (2018). To overcome the presumption of dismissal, a plaintiff must show that the "Seller acted fraudulently or with willful misconduct in submitting information to the

---

[1] L3 disagrees with Plaintiff as to the applicability of *Yearsley* and *Boyle* and reserves the right to assert the judicially-created defenses established in those cases. *See Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18 (1940); and *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

Secretary during the course of the Secretary's consideration of such technology under this subsection." 6 U.S.C. § 442(c) (2018).

Admittedly, no case has determined whether the presumption of a government contractor defense under the SAFETY Act applies to a particular Seller of QATT. Plaintiff no doubt will assert that his Complaint does not arise out of an act of terrorism, but L3's QATT definitively was deployed in defense against or response to or recovery from such an act. It is noteworthy that the SAFETY Act defines QATT as:

> "any product, equipment, service (including support services), device, or technology (including information technology) designed, developed, modified, or procured **for the specific purpose of preventing, detecting, identifying, or deterring acts of terrorism or limiting the harm such acts might otherwise cause**, that is designated as such by the Secretary." (Emphasis added.) 6 U.S.C. § 444 (2018).

The evolution of the technology contained in the L3 products targeted by Plaintiff in this matter was a direct result of the terrorist attacks of 9/11. The security needs at commercial airports became significantly more complex following those attacks. There is no question that Plaintiff's lawsuit arises out of or relates to the performance of L3's QATT for the specific purpose of preventing, detecting, identifying, or deterring acts of terrorism or limiting the harm such acts might otherwise cause.

Further, while the SAFETY Act Certification and Designation were signed on October 26, 2016, the Terms and Conditions for both documents state that they apply retroactively to all sales of the QATT going back to July 1, 2004. (See "Earliest Date of Sale" within the "Terms and Conditions.") This means that the TSA had been utilizing L3's QATT to identify and prevent acts of terror for more than 14 years at the time of Plaintiff's trip through the Phoenix-Mesa Gateway Airport on August 9, 2018. For added measure, it was not until a full year later, in August 2019, that Plaintiff developed his understanding that his "rights were violated." Complaint at ¶ 13. Hence, L3's QATT had been providing critical anti-terrorism screening at our Nation's airports for 15 years when Plaintiff filed the instant Complaint.

6

"It is hard to overestimate the need to search air travelers for weapons and explosives before they are allowed to board the aircraft. As illustrated over the last three decades, the potential damage and destruction from air terrorism is horrifically enormous." *United States v. Marquez*, 410 F.3d 612, 618 (9th Cir. 2005). To hold L3 liable for damages after all these years on the basis that its QATT invaded a passenger's privacy would not only deal a tremendous blow to our Nation's anti-terrorism defense apparatus, but it would also render the SAFETY Act virtually meaningless.

For these reasons, the Court should hold that L3's QATT is entitled to a rebuttable presumption of a government-contractor defense under 6 U.S.C. § 442(d)(1) (2018). Because Plaintiff has not alleged that L3 acted fraudulently in submitting information to the DHS in its application for SAFETY Act protections (see 6 U.S.C. § 442(c) (2018)), and because no set of facts exists under which Plaintiff can prove the same, the Court should dismiss Plaintiff's Complaint under Rule 12(b)(6).

### 2. L3's QATT is Not "Unlawful".

Even if the Court disagrees with L3's argument based on the SAFETY Act, Plaintiff's Complaint must still be dismissed for the simple reason that it rests on a false legal premise. Plaintiff contends that the use of Advanced Imaging Technology ("AIT") for airport passenger security screening "is limited, by Congress, to the surface of the skin and objects on the body," and that L3 violated his rights when it developed AIT capable of revealing his "human tissue information beneath the skin." Complaint at ¶ 21. Among the provisions that Plaintiff cites in support are 49 U.S.C § 44901(l)(a) and 49 C.F.R. § 1540.107. *Id*. at ¶¶ 14, 24. These provisions define the terms applicable to standards for screening airline passengers and property. Both provisions state that AIT:

> "(i) means a device used in the screening of passengers that creates a visual image of an individual showing the surface of the skin and revealing other objects on the body; and (ii) may include devices using backscatter x-rays or millimeter waves and devices referred to as whole-body imaging technology or body scanning machines." 49 U.S.C § 44901(l)(1)(A) (2018); 49 CFR § 1540.107 (2018).

As seen above, Plaintiff's contention that L3's QATT is "unlawful" is drawn from the first part of the definition, which references "a visual image of an individual showing the surface of the skin and revealing other objects on the body." However, Plaintiff ignores the second part of the definition, which provides that AIT may also include devices "using backscatter x-rays or millimeter waves and devices referred to as whole-body imaging technology or body scanning machines." In addition to revealing objects "on the body," backscatter x-rays can reveal matter "underneath and near the surface of the skin," such as medical implants. U.S. Dep't of Homeland Sec., Privacy Impact Assessment Update for TSA Advanced Imaging Technology, 3 (Jan. 25, 2011), available at http://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-tsa-ait.pdf. Millimeter wave technology generates images based on the energy reflected from the body. *Id*. These technologies are used to detect anomalies appearing on an image of a generic figure. *Id*. at 6. This is consistent with the DHS Certification and Designation of L3's QATT, which is designed to highlight "threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation." This is further consistent with the provisions cited by Plaintiff, which also define "automatic target recognition software" as: "software installed on an advanced imaging technology that produces a generic image of the individual being screened that is the same as the images produced for all other screened individuals." 49 U.S.C § 44901(l)(1)(C); 49 CFR § 1540.107 (2018).

In short, Plaintiff has alleged that L3's technology performed precisely to the standards and specifications set out by Congress and the DHS for airport passenger screening technology to be used by the TSA. Plaintiff alleges that L3's technology identified a "congenital disability" at his "right groin," which apparently consists of "entirely human tissue entirely beneath the skin." Complaint at ¶¶ 14-16. However, contrary to Plaintiff's contention, the identification of a congenital disability in the groin area is within the authorized capabilities of AIT "using backscatter x-rays or millimeter waves and devices referred to as whole-body imaging technology or body scanning machines." 49 U.S.C § 44901(l)(1)(A) (2018); 49 CFR § 1540.107 (2018). Because Plaintiff's entire Complaint rests on his contention that L3's technology unlawfully

detected an object beneath his skin, it should be dismissed under Rule 12(b)(6) based on a dispositive issue of law.

### 3. **Plaintiff cannot state the elements for any of his purported causes of action.**

In the alternative to the arguments advanced above, Plaintiff's Complaint should also be dismissed for his failure to state a proper claim against L3. It is undisputed that L3's technology is "sold commercially" and "used in a civilian setting by [the] Transportation Security Administration." *Id*. at ¶ 12. By extension, it is also undisputed that the TSA possessed and operated L3's QATT at the Phoenix-Mesa Gateway Airport on August 9, 2018. Plaintiff attempts to skirt this issue by arguing that L3 was "the direct cause of his damages," which "could not have happened without L3's reckless and unlawful actions." *Id*. at ¶ 15. This argument has no merit because the causes of action that Plaintiff identifies require specific intent. Plaintiff has also failed to identify any conduct on the part of L3 that would be considered highly offensive to a reasonable person—which is a required element for several of Plaintiff's purported causes of action. *See Marquez*, 410 F.3d at 618 (holding that the TSA's challenged screening procedures were reasonable and "geared towards detection and deterrence of airborne terrorism").

The first purported cause of action that Plaintiff identifies is for intrusion upon seclusion. (Complaint at ¶ 30). To state such a claim, Plaintiff must allege that L3 committed: (1) an intentional intrusion; (2) upon his private affairs; (3) that would be considered highly offensive to a reasonable person. *See Shepard v. Costco Wholesale Corporation*, 246 Ariz. 470, 476 (Ariz. Ct. App. 2019). Here, Plaintiff cannot plausibly claim that L3 *intentionally* intruded upon his private affairs or that L3's conduct would be considered highly offensive to a reasonable person.

Proceeding chronologically through Plaintiff's allegations, to state a common law claim for public disclosure of private facts (Complaint at ¶ 31), Plaintiff must show that L3: (1) published a matter concerning his private life that did not involve a legitimate public concern; (2) placed him before the public in a false light; (3) had knowledge of the falsity or acted in reckless disregard; and (4) engaged in conduct considered highly offensive to a reasonable person. *See Shepard*, 246 Ariz. at 476; *Hurry v. Financial Industry Regulatory Authority Incorporated*, No.

CV-02490-PHX-ROS, slip op. at 8 (D. Arizona Aug. 5, 2015). Here, given the undisputed fact that the TSA conducted the allegedly unconstitutional search, Plaintiff has no basis for his allegation that L3 "unlawfully displayed the exact location of [his] human tissue beneath the skin." Complaint at ¶ 15. Moreover, the publication element is met only when the matter is communicated to the public at large, or to so many persons that it is certain to become public knowledge. *Armato v. Doe*, No., 2012 U.S. Dist. LEXIS 190080, at *17 (D. Ariz. May 15, 2012). Even if Plaintiff could show that L3 "displayed" his private matter, he has not alleged that L3 published his private matter or placed him in a false light.

To state a common law claim for false imprisonment (Complaint at ¶ 32), Plaintiff must show that L3: (1) acted with intent to confine him within boundaries fixed by L3; (2) L3's actions resulted in such confinement, either directly or indirectly; and (3) Plaintiff was conscious of the confinement or was harmed by it. See *Hart v. Seven Resorts Inc.*, 190 Ariz. 272, 281 (Ariz. Ct. App. 1997). Here, even if Plaintiff can show that L3's actions indirectly resulted in his confinement, he has no basis to claim that L3 acted with the specific intent to confine him within boundaries fixed by L3.

Plaintiff's next purported cause of action is for common law "Product Liability Manufacturing Defect." Complaint at ¶ 33. To establish a *prima facie* case for strict product liability, Plaintiff must show that: (1) the product was defective in condition when it left the hands of L3; (2) the defect made the product unreasonably dangerous; and (3) the defect was a proximate cause of the plaintiff's injuries. *See Sw. Pet Prod., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1051 (D. Ariz. 2003) (citing *Jimenez v. Sears, Roebuck and Co.*, 183 Ariz. 399, 904 P.2d 861 (1995)). A defectively manufactured product is flawed because of mistakes during the manufacturing process. *Gomulka v. Yavapai Mach. & Auto Parts, Inc.*, 155 Ariz. 239, 241-42 (Ct. App. 1987). Here, because L3's QATT satisfied the standards and criteria for SAFETY Act Certification and Designation, and because nothing about L3's QATT is "unlawful," Plaintiff has no basis to claim that L3's QATT was defective or that it was unreasonably dangerous.

To state a product liability claim based on an information defect (Complaint at ¶ 34),

Plaintiff must show that: (1) L3 had a duty to warn of the product's dangerous propensities; and (2) the lack of adequate warning made the product defective and unreasonably dangerous. *Golonka v. General Motors Corp.*, 204 Ariz. 575, 588 (Ariz. Ct. App. 2003). Again, for the same reasons discussed in the paragraph above, Plaintiff has no basis to claim that L3's QATT was defective and unreasonably dangerous.

Plaintiff has identified his next purported cause of action as "Constitutional Tort – Right to Privacy – Arizona Constitution Article II Section 8." Complaint at ¶ 35. However, Article II, § 8 of the Arizona Constitution simply states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Arizona courts have construed this provision to have "the same general effect and purpose as the Fourth Amendment to the Constitution of the United States." *State v. Mixton*, 447 P.3d 829, 837 (Ct. App. 2019) (quoting *Turley v. State*, 48 Ariz. 61, 70-71, 59 P.2d 312 (1936)). Plaintiff has provided nothing to establish that Article II, § 8 of the Arizona Constitution establishes a private right of action.

To state a common law claim for intentional infliction of emotional distress (Complaint at ¶ 36), Plaintiff must show that: (1) L3's conduct was extreme and outrageous; (2) L3 intended to cause emotional distress or recklessly disregarded the near certainty that distress would result from its conduct; and (3) severe emotional distress did indeed occur as a result of L3's conduct. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987). Here, Plaintiff cannot plausibly claim that L3's conduct was extreme and outrageous or intended in any way to cause emotional distress.

Plaintiff's next purported cause of action is for taking chattels (Complaint at ¶ 37). This is akin to the tort of trespass upon chattels, which requires a showing that L3: (1) intentionally assumed physical control over the chattel and (2) dealt with the chattel in a way that destructed Plaintiff's possessory interest. *Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 331 (Ariz. Ct. App. 1988). The "chattel" identified by Plaintiff is apparently the "millimeter wave information regarding his human tissue underneath his skin," which Plaintiff alleges was converted into "proprietary code" under L3's exclusive control. (Complaint at ¶ 22). As with the rest of Plaintiff's allegations, it is unclear exactly how L3 would obtain Plaintiff's "millimeter wave information"

11

and convert it into "proprietary code." Regardless, because it is undisputed that the TSA possessed and operated L3's QATT at the Phoenix-Mesa Gateway Airport on August 9, 2018, Plaintiff cannot plausibly claim that L3 assumed physical control over any of his chattels.

To state a common law claim for conversion (Complaint at ¶ 38), Plaintiff must show that L3: (1) wrongfully exerted dominion and control over Plaintiff's personal property; and (2) "seriously interfered" with Plaintiff's rights in the same. *Miller v. Hehlen*, 209 Ariz. Ct. App. 462, 472 (2005). For the same reasons discussed in the paragraph above, Plaintiff cannot make out such a claim.

To state a claim for unjust enrichment (Complaint at ¶ 39), Plaintiff must show that: (1) L3 was enriched; (2) Plaintiff was impoverished; (3) a connection between L3's enrichment and Plaintiff's impoverishment; (4) the absence of justification for L3's enrichment and Plaintiff's impoverishment; and (5) the absence of a remedy at law. *See Span v. Maricopa County Treasurer*, 246 Ariz. 222, 227 (Ariz. Ct. App. 2019). This purported claim again rests on Plaintiff's confusing allegation that L3 somehow converted his "millimeter wave information" into "proprietary code"—as though there is an active market of prospective buyers seeking to decipher the physiological makeup of the "congenital defect" in Plaintiff's right groin. Even if this was the case, Plaintiff has not alleged that he was impoverished in any way.

Plaintiff next identifies "A.R.S. § 47-2318 – Third party beneficiaries of warranties express or implied." (Complaint at ¶ 40). Section 47-2318 states:

> "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is in injured in person by breach of warranty. A seller may not exclude or limit the operation of this section."

Here, even if Plaintiff could establish that the warranty contemplated by A.R.S. § 47-2318 extends to the QATT that L3 sold to the TSA, he has no basis to claim that L3 breached the warranty or that he was injured by such a breach.

Plaintiff's next action is labeled: "Constitutional Tort – Due Process – Arizona Constitution

12

Article II Section 4." (Complaint at ¶ 41). This section states that "no person shall be deprived life, liberty, or property without due process of law." Arizona's due process clause is construed similarly to the same clause in the U.S. Constitution. *See generally Villalpando v. Reagan*, 211 Ariz. 305, 307 (Ariz. Ct. Ap. 2005). Plaintiff has not shown that Arizona's due process clause establishes a private right of action.

Finally, Plaintiff seeks injunctive relief "requiring L3 to return [his] August 9, 2018 AIT scan 'Code' to him." (Complaint at ¶ 48). L3 cannot plausibly provide such relief, because it is undisputed that L3 was never in possession of his "Code." Further, although the TSA may at one point have possessed the image produced by L3's QATT, the TSA would have destroyed the image as soon as Plaintiff was cleared to travel.

> "The TSA has also taken steps to mitigate the effect a scan using AIT might have upon passenger privacy: Each image produced by a scanner passes through a filter to obscure facial features and is viewable on a computer screen only by an officer sitting in a remote and secure room. As soon as the passenger has been cleared, moreover, the image is deleted; the officer cannot retain the image on his computer, nor is he permitted to bring a cell phone or camera into the secure room." *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 653 F.3d 1, 4, 2011 U.S. App. LEXIS 14503, *4 (D.C. Cir. July 15, 2011)

## VI.   CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant, L3HARRIS TECHNOLOGIES, INC., respectfully requests that this Court dismiss Plaintiff's Complaint in its entirety with prejudice, and for such further relief as the Court may deem just.

13

**RESPECTFULLY SUBMITTED** this 29th day of January, 2020.

**SANDERS & PARKS, P.C.**

By   */s/ Ryan P. Sandstrom*
Mark G. Worischeck
Ryan P. Sandstrom
3030 North Third Street, Suite 1300
Phoenix, AZ  85012-3099

Michael G. McQuillen (admitted *pro hac vice*)
Christopher J. Raistrick (admitted *pro hac vice*)
Mark S. Susina (admitted *pro hac vice*)
Richard C. Harris (admitted *pro hac vice*)
**ADLER MURPHY & McQUILLEN, LLP**
20 S. Clark St., Suite 2500
Chicago, Illinois 60603
*Attorneys for Defendant L3Harris Technologies, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.

With a copy sent via U.S. Mail and email to:

Michael Gibson Muir
3255 S. Dorsey Lane
Apt. 1036
Tempe, AZ 85282
blaxwan@yahoo.com
*Plaintiff Pro Per*

By:   */s/ Katie Martin*

14