1

2

3

4

Michael Gibson Muir
19 Inglewood Ln.
Bloomington, IL 61704
712-309-6121

FILED ☒   ___ LODGED
___ RECEIVED   ___ COPY

MAR 2 7 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

5

6

7

**IN THE UNITED STATES DISTRICT COURT**

8

**FOR THE DISTRICT OF ARIZONA**

9

10

Michael Gibson Muir                              )
                                                 )
11        Plaintiff,                             )
                                                 )
12        v.                                      )        **Case No. 2:19-cv-05887-DGC**
                                                 )
13                                               )
14  L3Harris Technologies, Inc., a Delaware       )
    for-profit corporation                       )
15                                               )
                                                 )
16        Defendant.                             )

17

**PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION IN OPPOSITION TO**

18

**DEFENDANT'S MOTION TO DISMISS**

19

20

21

22

23

24

25

26

27

28

Plaintiff, Michael Gibson Muir ("Muir"), in reply to Defendant, L3Harris Technologies, Inc. ("L3")'s "Reply in Support of Its Motion to Dismiss Plaintiff's Complaint" ("L3's Reply") and in further support of his "Motion in Opposition to Defendant's Motion to Dismiss & Brief in Support" pursuant to Federal Rule of Civil Procedure 12(b)(6), respectfully states as follows.

## I. Introduction

L3 and Muir are unable to agree due to (1) L3's ongoing deliberate indifference to Muir, (2) L3's refusal to accept its duty to Muir and (3) L3's refusal to accept certain medical, legal and technological realities.

L3 wields much State authority, but that authority does not include the ability to redefine the meaning of words in order to claim an immunity defense to which it is not entitled, ignore its responsibilities under the United States Constitution and International Covenant on Civil and Political Rights, or inappropriately apply statutory language in order to justify the presence of correctable defects in its ATR software product.

Muir's demands for injunctive relief outside of Section 504 are plausible, feasible and readily achievable and L3 cannot feign technological ignorance and put forth the theory that it is impossible for L3 to possess Muir's August 9, 2018 passenger screening image data, when it is not only possible, but according to facts which could be plead, probable.

And Muir's decision to allow his body to adapt to the effects of his birth defect instead of having invasive and unpredictable surgery is rooted in faith and Muir believes that his uncommon choice will be proven medically effective (through the comparison of

his August 9, 2018 scan and a future scan which will show exactly how his body has adapted over the past six years) and this will demonstrate the power of the Creator and that Muir's years of intense pain and risk of serious long term injury or death were part of the necessary price of his natural "healing" (Muir's disability can never actually "heal", but his body can adapt so that his intestine does not become incarcerated or strangulated and his nausea disappears and his other symptoms disappear and he gets his life back) and were it not for L3's interference in Muir's personal relationship with the Creator during his most painful years of "wait and see", Muir would be well on the path to getting his life back, instead of dealing with the constant presence of The Shadow, whose creation could and should have been prevented and which now disturbs Muir every day as the most horrible part of his deeply engrained and long running "pain memory" which, as Muir has learned over many years of dealing with his disability, will never go away.

## II. Argument

### (1) L3's ongoing deliberate indifference to Muir

L3 displays its ongoing deliberate indifference to Muir through its incorrect statements regarding checkpoint screening procedures, its incorrect assumptions regarding Muir and its shocking "summation" of actual events of which it presently has no knowledge but for which facts exist (Muir's TSA personal injury claim for events that occurred on August 9, 2018, which is still under investigation) that demonstrate L3's ongoing failure to act with reasonable care in matters critically important to Muir's claim and refute the notion that L3 is compassionate to or understanding of Muir's situation (the ongoing unlawful discrimination he faces because of L3's defective ATR software

product) or its constitutional and statutory duty to Muir.

L3 stated (L3's Reply, Pg. 10):

"It is worth noting that Plaintiff could have easily avoided the public humiliation he alleges was caused by his ordeal at the Phoenix-Mesa Gateway Airport on August 9, 2018. He could have simply opted for a pat-down that would have been conducted privately by an officer of the same sex. *See Electronic Privacy*, 653 F.3d at 3. This would have allowed Plaintiff to explain his condition in a safe space and alleviate his potential embarrassment to the greatest extent possible."

With the above statement, L3 makes clear it is not only recklessly unaware of the details of the checkpoint screening procedures it helps to administer, but callously uninterested in fully acknowledging its statutory and constitutional responsibilities as a powerful and trusted actor wielding immense State authority.

L3's failure to demonstrate it possesses a complete understanding of passenger screening procedures while it simultaneously controls the proprietary source code of the algorithm that conducts the administrative search of two million passengers per day is an illogical contradiction that cannot continue.

L3's absurd suggestion that Muir "could have easily avoided" what happened to him by simply explaining his condition in a "safe space" is completely disproven by DHS policies, existing case law and the facts of Muir's pending TSA personal injury claim (which was presented to TSA on September 16, 2019).

Muir's second shocking encounter with TSA officials (Muir's second pending personal injury claim, which was presented to TSA on September 5, 2019 for events that occurred outside of Arizona) in the private "safe space" Defendant suggests would have

4

allowed Muir the opportunity to explain his situation, was even more degrading, embarrassing, painful, horrifying and damaging than his experience in public at IWA on August 9, 2018.

To suggest that Muir spent many hours (enduring great physical pain for many hours on public transportation in order to have access to legal databases) researching and navigating complex tort and constitutional law when he could have simply explained his situation to TSA officials approaches on offensive, both in regards to the implication that Muir's Compliant is anything less than necessary for the vindication of his rights and also that Muir would voluntarily choose to plead his most private of health matters despite there being another way for him to simply explain his situation and be made whole.

Muir made official complaints to TSA Civil Rights Office, DHS Office of Civil Rights and Civil Liberties, DHS TRIP Program and Congressman Greg Stanton's office and Muir was denied relief in all his attempts at achieving redress through those channels.

L3 also stated (L3's Reply, Pg. 10):

> "We now know that the anomaly TSA officials detected using L3's QATT was Plaintiff's naturally occurring health condition, but the TSA officials had no way of knowing that at the time. The anomaly could just as easily have been a concealed device which posed a safety threat."

Muir's "naturally occurring health condition" is a congenital birth defect that qualifies him for protection under Section 504 and Muir's peritoneal fluid, intestine and other internal organs are not anomalies (all are present in almost every human being), nor is the fact that the right side of his scrotum was larger than usual on August 9, 2018 due

solely to his birth defect because Muir's reproductive anatomy is consistent with his gender and the "male" selection that the TSA agent initiating the passenger screening scan chooses to apply the correct algorithm for Muir's gender.

L3 is wrong in assuming TSA officials didn't know Muir had a naturally occurring health condition because Muir told them directly and repeatedly. He also told them that no one, not even his doctor, had ever touched him at his right groin during a serious health emergency like the one he was experiencing and he repeatedly pleaded with them not to be touched. TSA officials were totally indifferent to Muir's serious medical needs and L3 knows or should have known that TSA officials' knowledge of Muir's congenital disability and health emergency makes no difference with regards to mandatory screening procedures and to suggest otherwise is ridiculous and L3 can cite no regulations or case law authorizing the alteration of mandatory screening procedures because none exist. Threat alarms generated by L3's proprietary ATR software MUST be resolved by physical pat-down in order for the passenger to be released from TSA custody. There are no exceptions. L3's refusal to accept that its defective proprietary ATR software "singling out" Muir solely due to his congenital disability is the sole reason Muir was detained for an additional physical pat-down of his right groin cannot change the fact that but for L3's defective software discriminating against him, Muir would have suffered no damages, as was the case on June 6, 2019, when Muir was not symptomatic due to his disability.

**(2) L3's refusal to accept its duty to Muir**

L3 and Muir are unable to agree on several points including (i) Muir's pleadings

(L3 fails to accept unambiguous statements from Muir's First Amended Complaint with regards to Muir's qualification as an individual with a disability and L3's status as a corporate entity bound by Rehabilitation Act of 1973 Section 504), (ii) Muir's following Rules of Civil Procedure (L3's removal of CV2019-013495 to District of Arizona made COUNT 1 of Muir's First Amended Complaint applicable and actionable) and (iii) L3's lack of immunity for its proprietary ATR software (DHS did not include "software" in its Certification of L3's hardware).

**(i) Muir's pleadings**

L3 stated (L3's Reply, Pg. 9):

"Plaintiff has made no effort to show that his health condition qualifies him as being "disabled" under Rehabilitation Act of 1973, or that L3 qualifies as a corporate entity bound by Section 504."

Muir disagrees.

**(a) Muir made a clear effort to show he is qualified as an individual with a disability**

Muir clearly stated in his First Amended Complaint at paragraph 7 that:

"Plaintiff Muir is a... qualified individual under... 42 U.S.C. § 12102."

Muir stated in the most straightforward manner possible that he was qualified under the relevant statute because he is qualified under the relevant statute. This demonstrates a clear effort to inform L3 that Muir is an individual with a disability as defined by Congress.

Muir was aware of no case law requiring him to specifically list his most private ailments or his private health information in his Complaint in order to satisfy the facial

plausibility requirement.

Muir is aware of the requirements of 42 U.S.C. § 12102(1)(A), (B), 2(A), (B) and pleaded his qualification at paragraph 7 of his First Amended Complaint based on his verifiable record of having such impairments lasting longer than six months.

**(b) Muir clearly demonstrated that L3 is a corporate entity bound by Section 504**

L3 states (L3's Reply, Pg. 9):

"A corporate entity like L3 can qualify as a "program or activity" bound by Section 504 if: (1) the entity receives federal assistance as a whole; or (2) it is principally engaged in the business of providing services related to education, health care, housing, social services, or parks and recreation. 29 U.S.C. § 794(b)(3)(A); *Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940 (9th Cir. 2009); *see also Haybarger v. Lawrence County Adult Prob. & Parole*, 551 F.3d 193, 199 (3d Cir. 2008) (narrowly construing "program or activity" to reach "only the specific parts of a recipient's operation which directly benefited from federal assistance").

Muir stated in his First Amended Complaint:

24. L3's "commercial aviation" division includes its "Airline Academy".
25. L3's "Airline Academy" is in direct receipt of U.S. Department of Education Title IV "federal financial assistance", therefore, L3 is a "Title IV organization".
26. L3's "commercial aviation" division also includes "security and detection systems".
27. L3's proprietary ATR software is a "security and detection systems" product.
28. L3's "commercial aviation" division (and by extension, L3 itself) is, as a "Title IV organization", therefore, "on notice" and bound by Rehabilitation Act of 1973 Section 504.

It is undisputed that L3 "receives federal assistance as a whole" to its "Commercial Aviation" division flight school (L3's "Airline Academy") via federally guaranteed student loans (making L3 a "Title IV Organization"). Therefore, it is

8

undisputed that L3 "receives federal assistance as a whole" and is bound by Section 504.

Furthermore, under Third Circuit interpretation, L3 receives federal assistance to its "Commercial Aviation" division, the same for-profit division that produces its "security and detection systems" products, which includes is proprietary ATR software. The direct receipt of funds solidifies L3's "Commercial Aviation" division as the "specific part" of L3's corporate operation that "directly benefited from federal assistance" and therefore L3 is bound by Section 504.

Muir made an effort (Muir's First Amended Complaint, paragraphs 25-28) to show that L3 is a corporate entity bound by Section 504 under both circumstances.

Therefore, contrary to L3's assertion, Muir made an "effort to show that his health condition qualifies him as being "disabled" under Rehabilitation Act of 1973, [and] that L3 qualifies as a corporate entity bound by Section 504."

**(ii) Muir followed Rules of Civil Procedure**

L3 stated (L3's Reply, Pg. 9):

> "Plaintiff's Response is focused largely on establishing that he is the victim of ongoing discrimination, a claim he did not raise in his Complaint. Setting aside this procedural violation, Plaintiff's allegations make it clear he lacks any basis for making such a claim."

Muir disagrees.

Arizona does not have an anti-discrimination law. Therefore, Muir could not raise his discrimination claim in CV2019-013495 because the Superior Court in Maricopa County could not adjudicate his federal claim without a corresponding Arizona state law.

L3 removed CV2019-013495 to District of Arizona, which allowed Muir to amend

his Complaint to include the previously inapplicable federal claim.

Muir would not have raised his Section 504 discrimination claim until he filed his second lawsuit, in federal district court, for the second incident (in a state that *has* an applicable corresponding anti-discrimination law).

**(iii) L3's lack of immunity for its proprietary ATR software**

Muir continues to disagree with L3's assessment of the applicability of the "SAFETY Act" to its proprietary ATR software for the same reasons previously stated.

First, it is not only practical, but a current technological reality that checkpoint security hardware and software are treated separately. L3 openly states that its "portals" are altered to meet contract specifications and this includes, at DHS command, the ability to utilize different software to conduct the passenger screening image "search".

DHS did not administer a contest for new screening "portals", or "models of Technology", but specifically for a "Passenger Screening Algorithm", the software that "searches" passenger screening image data produced by the "portal".

Therefore, it is not only practical for DHS to contract for hardware that can utilize different software to perform the administrative search, but a practical reality because DHS has already taken concrete steps to develop its own algorithm to replace L3's proprietary software because of the constant false threat alarms that L3 has knowingly allowed to persist for years.

Also, a reasonable person would agree with Muir in his belief that high-level DHS and DOJ attorneys are very precise with language, especially with regards to complex matters involving liability and immunity from suit and if they had intended to extend

"SAFETY Act" protections to L3's proprietary ATR software, they would have listed "software" in the "Also included" clause of the Certification. They did not.

The idea that "software" is automatically included might make sense if DHS had not deliberately created an "Also included" clause. DHS *did* create an "Also included" clause, which implies it did not intend for the Certification to automatically include anything other than what is specifically listed. "Software" is not listed and thus not included.

And, DHS was fully aware of the serious and ongoing problems with L3's proprietary ATR software when it Certified L3's "portals" on October 26, 2016, so it is perfectly logical to suggest that DHS did not intend to confer "SAFETY Act" protections on L3's software because DHS knew that L3's software performed very poorly  and that L3 had not taken satisfactory steps to fix the situation because false threat alarms continued to be one of the most significant factors contributing to delays at airport checkpoints.

Second, it was held that the widespread deployment of AIT at airports constituted a "significant" change in DHS administrative procedure and as such required a notice and comment period. The privacy concerns raised during the course of that comment period ultimately led to Congress requiring ATR software to replace a human TSA agent during the "search" of the passenger screening image produced by L3's millimeter wave scanners. Congress did not specify that the ATR software used had to be manufactured by the same company that manufactured the AIT "portals", only that any "portals" DHS purchased utilized ATR software in place of a TSA agent in a booth (directly due to

11

privacy concerns).

L3 stated (L3's Reply, Pg. 5):

"L3 previously noted that authorized whole-body imaging technologies and body scanning machines can detect objects located directly beneath the surface of the skin, such as medical implants."

L3's continued reliance on its belief that it is lawful for its millimeter wave machines to detect objects underneath the skin it based on statutory language that refers to backscatter x-ray machines (the hardware "portals" whose use was discontinued at checkpoints due to overwhelming privacy concerns) not millimeter wave machines, whose use was continued precisely because they do not "alarm" on medical implants or artificial joints.

Muir accepts that backscatter x-ray machines are capable of detecting objects beneath the skin (those machines are still in use in military settings), but the ability of a domestic security "portal" to detect objects is not the same as the authorization to "search" passenger screening image data outside of Congressional limits. If Congress did not intend to limit the scope of passenger screening searches to the surface of the skin, it would not have included such specific language in the statute limiting searches to the surface of the skin. L3 must code its algorithm in order to comply with the laws regarding searches as well as imaging. Muir accepts that his internal organs will be imaged, but Muir does not accept that the passenger screening image data representing his internal organs underneath his skin is subject to search by L3's proprietary ATR software.

Third, Muir contends not that L3 is entitled to any government contractor defense,

but that if, because of L3's size and involvement in military contracts, L3 has confidential agreements with the United States of which Muir is unaware, then regardless of any potential "special" confidential status or designation (and any immunity such a confidential special status may confer that Muir does not presently understand) L3, like the United States government, cannot violate the United States Constitution or international treaties to which the United States is a party.

This theory is based on a logical, though admittedly unlikely, extension of L3's statement (L3's Motion to Dismiss, Pg. 3):

> "There are broad nondisclosure protections for the materials submitted to DHS during the application process—all such materials are deemed "SAFETY Act Confidential Information." 6 CFR §§ 25.2, 25.10 (2018)."

Muir has no way of knowing what kinds of "materials" or information this statement covers, but his claim no doubt approaches the territory where security issues become relevant and Muir's demands for injunctive relief outside of Section 504 are potentially implicated by confidential information designation and this will be addressed in a later paragraph.

Fourth, Muir and L3 are able to agree that Muir's claim for injunctive relief under Section 504 survives regardless of the Court's decision regarding the applicability of the "SAFETY Act" to the rest of Muir's claim.

**(3) L3's refusal to accept certain medical, legal and technological realities**

L3 cannot refuse to accept that (i) Muir is a qualified individual with a disability, (ii) L3 is a corporate entity bound by Section 504, (iii) Muir's August 9, 2018 scan image

data could plausibly exist on L3's system, (iv) Muir has a viable cause of action and, (v) Muir's private family medical choices and his private relationship with the Creator are not automatically subordinate to national security issues under the United States Constitution.

L3 concludes (L3's Reply, Pg. 11) that:

> "Requiring L3's QATT to decipher the difference between the two objects would be to impose an impractical burden that would weaken our Nation's national security apparatus. That is why, contrary to Plaintiff's contention, Congress has imposed no such burden."

Muir disagrees.

First, L3's commitment to strengthening the national security apparatus would be best demonstrated by a tireless dedication to achieving a 0% error rate with regards to anomaly threat alarms. L3's proprietary ATR software source code currently has an error rate much higher than 0%, though the true figure is currently classified. L3 knows the error rate is unacceptable and leads to unnecessary and invasive pat-downs, but has failed to correct the problem.

Second, L3's refusal to accept that Muir's peritoneal fluid and living human tissue are not "objects" does not make it so. Congress could not have intended the word "object" to include necessary parts of human anatomy that are naturally occurring and underneath the skin. The word "object" refers to foreign, man-made material and Muir's peritoneal fluid (which unpredictably collects in the right side of his scrotum and which was the actual cause of the false threat alarm) is not an object.

Third, L3's claim that following U.S. law and Section 504 is an "impractical

burden" is nonsensical because L3 has a market capitalization of over forty billion dollars and the TSA checkpoint contract is worth around one hundred and seventy five million dollars and DHS will end up fixing L3's defective ATR software product for a tiny fraction of the value of the contract. A tiny fraction cannot be seen as an "undue burden", especially for a company that accepted and directly benefitted from federal funds.

Congress imposed the "burden" in 1973. As such, L3 should have known of its burden as soon as it directly accepted and benefited from federal funds.

**(i) Muir is a qualified individual with a disability**

L3 states (L3's Reply, Pg. 10):

"Plaintiff's allegations of discrimination based solely on his medical condition show that he cannot state a claim for discrimination in any context, much less under the guise of a claim under the Rehabilitation Act of 1973."

Muir disagrees.

L3 states (L3's Reply, Pg. 9):

"To qualify as being "disabled" under the Rehabilitation Act of 1973, one must have: (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such impairment; or (3) be regarded as having such impairment. *Marquez v. Glendale Union High School District*, 2018 U.S. Dist. LEXIS 173343, at *42 (D. Ariz. Oct. 9, 2018)."

It is an undisputed medical reality that Muir qualifies as an individual with a disability because he has a congenital birth defect that unpredictably presents as a physical impairment that substantially limits his ability to: (1) care for himself, (2) perform manual tasks, (3) eat, (4) stand, (5) learn, (6) concentrate, or (7) work, as well as

(8) digest food, (9) expel intestinal gas, (10), move his bowels, and (11) urinate.

Muir's latest onset of severe symptoms due to his birth defect began suddenly and unexpectedly in November 2016 (his first intestinal incarceration in thirteen years) and continues to the present day.

In retrospect, over the longer timeframe of 2014 thru present day, Muir's symptoms were in many ways the most severe from November 2016 to December 2018, during which time he suffered no fewer than five potentially life-threatening incidents due to incarceration or partial strangulation of his intestine, one of which (November 8, 2018) culminated in a police-documented first-responder incident and Muir's withdraw from his community college Calculus I class due to his inability to concentrate or work.

L3 states:

"Plaintiff's allegations of discrimination based solely on his medical condition show that he cannot state a claim for discrimination in any context, much less under the guise of a claim under the Rehabilitation Act of 1973."

Muir disagrees.

L3 states on page 10 of its Reply:

"Any claim for discrimination requires a showing of unequal treatment compared to people in similar circumstances. *Freeman*, 68 F.3d at 1187. A plaintiff claiming discrimination must identify a similarly situated class, known as the control group, and then must isolate the factor allegedly subject to impermissible discrimination. *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989)."

L3 also states:

"To state a claim for discrimination against L3, Plaintiff would need to

allege that L3 designed its QATT to: (1) recognize the physiological makeup of all hernia's occurring in the control group; and (2) single out Plaintiff's hernia as the only one to register as an anomaly"

Muir's claim satisfies the "control group" requirement through his identification of a "similarly situated class" that consists of men with a groin hernia who choose to have surgical intervention in order to repair it. (This is the vast majority of men, especially those who suffer from as much pain as Muir does.)

The "control group" in the instant case is the large group of travelers who achieved medical "success" in repairing their hernias with their chosen surgical procedures. These men's private medical choices with regards to their groin hernias are not identified by L3's proprietary ATR software because it correctly identifies their human tissue underneath their skin as human tissue and not a potential threat object.

Muir's claim satisfies the "isolated factor" requirement because he clearly identified his congenital physical disorder at his right groin as the "factor subject to impermissible discrimination".

Muir made a private family health decision (after many prayerful moments and deep consultation with his wife, whose life would end up being severely impacted by the decision) to defer such a complicated matter to the Creator and took a "wait and see" approach with regards to his highly complex congenital disorder, which is a medically acceptable choice. This private medical and religious choice led to daily physical pain and the limiting of major life activities which most men cannot or choose not to endure.

Muir cannot be punished because he has developed a high tolerance for pain due

to his struggles with his congenital disability and other related co-morbidities and physiological conditions that have caused him great physical pain since he was eight years old (actually, five years old, but Muir cannot personally remember those incidents).

Muir's choice to decline emergency surgery several times during 2018 and leave his birth defect in its natural state (to allow his body to compensate through natural processes as determined by the Creator) is the sole reason that Muir was "singled out" by L3's proprietary ATR software and this sole reason for his being "singled out" is impermissible under Section 504 and the United States Constitution.

Muir's claim also satisfies the "control group" and "isolated factor" requirements because Muir is himself both the "control group" (on June 6, 2019, Muir was asymptomatic at his right groin, which mimicked the control group (the group who chose surgical intervention and whose choice Muir's mimicked, it just took much longer for Muir to, hopefully, achieve a similar result through natural processes), and L3's proprietary ATR software did not identify his human tissue as a potential threat object on the surface of his skin)) and the "isolated factor" (on August 9, 2018, Muir was symptomatic at his right groin due solely to his congenital disability and this is the sole "isolated factor" that was impermissibly "singled out" by L3's proprietary ATR software in violation of Section 504).

**(ii) L3 is bound by Section 504**

As discussed above, L3 cannot refuse to accept the legal reality that it is a corporate entity bound by Section 504.

Muir also finds it hard to accept the idea that L3 is understanding of, or

sympathetic to, his condition, in part because Muir could locate L3's mention of Section 504 only one time, and that was in relation to employment at L3.

Muir could locate no corporate compliance office, no office of civil rights or anything approaching a public interface and a reasonable person would agree with Muir that his concern over L3's lack of stated support for upholding the United States Constitution in its daily administrative search of two million passengers is troubling.

**(iii) Muir's August 9, 2018 Passenger Screening Image Data**

L3 states (L3's Reply, Pg. 8):

> "Plaintiff has not rebutted the Declaration from L3's Vice President and General Counsel stating that L3 lacked control over the QATT once it was sold to the TSA, so it is unclear why Plaintiff alleges that L3 possesses his 'scan code.'"

It is undisputed that L3's proprietary ATR software source code is under its sole control (DHS "purchase" of L3's ATR software cycles to use on "portals" under contract does not give DHS "control" over L3's proprietary source code). L3's "Declaration" is largely irrelevant because it is not "control" of the Technology that is important to Muir's claim, but "access" to the Technology and the data it produces (which is then analyzed by L3's proprietary algorithm).

Included in L3's Certified "Technology" are "maintenance services" (L3's Motion to Dismiss, Pg. 14), which implies that L3 retains some level of programmer access, but L3's service manual for its millimeter wave scanner does not specify (1) methods by which L3 accesses the "portals" under contract in order to provide its "maintenance services" (including network connectivity, remote access capability and DHS approved

data paths), (2) methods by which new software cycles are installed on individual millimeter wave machines in use by TSA, (3) methods by which L3 ensures that Muir's passenger screening image data is actually destroyed, and (4) methods by which L3 ensures that Muir's passenger screening image data is not inadvertently retained or transferred off its "portal" via fiber optic cable, wireless transmission or physical "portal" access by authorized maintenance technicians.

A reasonable person would agree with Muir is his belief that the destruction of data is a complex, expensive and time-consuming exercise. L3's "Declaration" provides no technical details in exactly how L3 complies with Congressional mandates with regards to data destruction and the fact that L3 has an interest in a business unit in China that produces software to manage the flow of health data gives Muir pause.

Also, L3's "Declaration" offers no specificity with regards to the process by which L3's algorithm performs the search of Muir's "portal" data (Muir has no way of knowing if his August 9, 2018 IWA passenger screening image data was processed directly on the IWA "portal" hardware, transferred to separate hardware located at the IWA checkpoint or transferred to separate hardware located somewhere other than the IWA checkpoint), and if Muir's passenger screening image data was transferred, Muir has no way of knowing who had control of and access to any hardware, switches or fiber optics that Muir's data traveled or where those physical materials are presently located.

Some of these issues fall under the authority of GSA, DHS and TSA and Muir will address the path and flow of his passenger screening image data further as he joins additional parties and completes litigation hold demands and FOIA requests.

**(iv) Muir has a cause of action**

L3 stated (L3's Reply, Pg. 7):

"L3 was not present at the time of the alleged false imprisonment"

Muir disagrees.

L3 was present through the amazing technological reach of its proprietary source code. L3's ATR software is present at, and responsible for, every single passenger screening image data search conducted by TSA.

L3 is thus omnipresent, a unique quality in administrative search history, which makes L3 directly responsible for the search of every single passenger, at every single airport under contract, all simultaneously. This is a level of power, responsibility and trust that no single TSA agent in a remote viewing booth had ever possessed (it is not the Certified "portal" that conducts the search, but L3's defective ATR software).

L3 cannot refuse to accept that it is solely in control of its proprietary ATR software source code. L3 also cannot refuse to accept that by solely controlling the programming of the source code of the algorithm, L3 solely controls whether or not millions of travelers are detained for further mandatory physical screening.

L3 stated (L3's Reply, Pg. 8):

Plaintiff is also unable to state a claim against L3 for the Taking of Chattels or Conversion, because L3 has never assumed physical control over any of his chattels or personal property.

L3 has made no statements regarding the method by which Muir's August 9, 2018 passenger screening image data was processed, so it is currently unconfirmed whether or

not Muir's scan data existed or exists on any of L3's servers, switches, hardware or networks.

### (v) Muir's Private Relationship with the Creator is constitutionally protected

Muir's private relationship with the Creator is a constitutionally protected and ongoing relationship. Muir's commitment to his chosen medical course of action is a daily commitment grounded in faith and requiring Muir's active participation in order to endure the physical pain.

L3 didn't just violate Muir's privacy by revealing his hidden congenital disability, L3 interfered in Muir's private relationship with the Creator by unlawfully calling into question Muir's private family medical decisions when it unlawfully "singled out" Muir for discriminatory and degrading treatment solely because of the private medical choices to which his ongoing faith led him. L3's revelation of Muir's private health information didn't just lead to his embarrassment and humiliation. L3's revelation of Muir's birth defect led to his torture and creation of The Shadow, a menacing, omnipresence that feels as though it is reaching in and touching Muir's insides every time Muir feels pain or is forced to recall the incident. This traumatic bonding goes back to an intense pain incident Muir suffered when he was fourteen. Muir was forced to endure a grueling thirty minute ride confined in an ambulance driving over a road under construction, and every bump in the unsurfaced road caused Muir extreme pain due to his traumatic injury. It was during the overall two hours of extreme pain that Muir was forced to adapt and learn to deny and rank his pain in order to get through it. For reasons Muir cannot explain, L3 and The Shadow are now in the back of the ambulance in Muir's memory and this is what is so

disturbing to Muir and precisely the reason that torture is not permitted under any circumstance. Muir cannot control the circuits that pain stimulus travel and there is now no way for Muir to undo what has been done and even after he is able to concentrate, work, hike, climb, train and return to his previous abilities with his new physical adaptation preventing him for suffering any more life-threatening incidents, The Shadow will remain. This is wrong and Muir prays the Court will allow him the ability to be made as whole as possible.

**III. Conclusion**

L3's technology products exposed Muir's private health information in violation of the United States Constitution. There is no immunity for constitutional violations involving incompetence. A reasonable person would agree with Muir that L3's proprietary ATR software replaced TSA agents (due to privacy concerns) responsible for viewing passenger screening images at hundreds of U.S. airports. This replacement of human judgment with L3's proprietary ATR software came with the responsibility that all government agents have, which is to abide by the United States Constitution and L3's failure to code its algorithm to function within United States law and to properly acknowledge the legal and constitutional implications of a medical condition that affects nearly 25% of men in their lives is incompetent.

A reasonable person would also agree with Muir that L3's stated interest in protecting United States citizens would have been best expressed in an overwhelming desire to develop the best possible ATR software (0% false threat alarm is achievable) instead of allowing persistent false threat alarms to subject travelers to invasive pat-

downs for years and forcing U.S. taxpayers to pay to fix L3's defective product through an open source algorithm development contest.

Muir has satisfied the requirements for a cause of action under Section 504 and again prays that the Court will exercise its authority under the United States Constitution and pull him out of the snake pit.

WHEREFORE, for the foregoing reasons, Plaintiff, Muir, respectfully requests that Defendant, L3Harris Technologies, Inc.'s Motion to Dismiss be denied.

Dated: this 27th day of March, 2020

Respectfully submitted,

MICHAEL GIBSON MUIR