Mark G. Worischeck/Bar No. 011147
Ryan P. Sandstrom/Bar No. 029862
**SANDERS & PARKS, P.C.**
3030 North Third Street, Suite 1300
Phoenix, AZ 85012-3099
Phone: 602.532.5795
Mark.Worischeck@sandersparks.com
Ryan.Sandstrom@sandersparks.com

Michael G. McQuillen/IL Bar No. 6188166
(*admitted pro hac vice*)
Christopher J. Raistrick/IL Bar No. 6237922
(*admitted pro hac vice*)
Mark S. Susina/IL Bar No. 6201998
(*admitted pro hac vice*)
Richard C. Harris/IL Bar No. 6313005
(*admitted pro hac vice*)
**ADLER MURPHY & McQUILLEN, LLP**
20 S. Clark St., Suite 2500
Chicago, Illinois 60603
Phone: 312.345-0700
mmcquillen@amm-law.com
craistrick@amm-law.com
msusina@amm-law.com
rharris@amm-law.com

*Attorneys for Defendant L3Harris Technologies, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Michael Gibson Muir, a natural man living in Tempe, Arizona,<br><br>Plaintiff,<br><br>v.<br><br>L3Harris Technologies, Inc., a Delaware for-profit corporation,<br><br>Defendant. | Case No. 2:19-cv-05887-DGC<br><br>**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT** |

Defendant, L3HARRIS TECHNOLOGIES, INC. ("L3"), hereby moves to dismiss Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and in support submits this incorporated Memorandum of Law.

**Certification of Conferral**

Pursuant to this Court's Order, dated December 27, 2019 (Doc. No. 8), the undersigned counsel hereby certifies that the parties have conferred to determine whether an amendment could cure Plaintiff's deficient pleading, and have been unable to agree that the pleading is curable by permissible amendment.

**I.   INTRODUCTION**

On December 2, 2019, Plaintiff filed his *pro se* Complaint in the Superior Court of Arizona in Maricopa County in case number CV2019-013495. On December 23, 2019, L3 filed a notice of removal to this Court. On January 29, 2020, L3 filed a motion to dismiss Plaintiff's Complaint for failure to state a valid claim for relief. On February 12, 2020, again acting *pro se*, Plaintiff filed his First Amended Complaint. On May 20, 2020, this Court entered an Order recognizing the propriety and timeliness of Plaintiff's First Amended Complaint and denying L3's motion to dismiss Plaintiff's original Complaint as moot. The Court further directed L3 to answer or otherwise respond to the First Amended Complaint by June 5, 2020.

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when it fails to state a claim upon which relief may be granted. Plaintiff's First Amended Complaint should be dismissed under Rule 12(b)(6) because neither the facts pled, nor any facts that may be pled, can state any claim against L3 for which relief may be granted.

**II.   PROCEDURAL POSTURE OF THE FIRST AMENDED COMPLAINT**

Several allegations in the First Amended Complaint are drafted to counter points raised by L3 in its motion to dismiss the original Complaint. However, the First Amended Complaint has superseded the original Complaint such that the original Complaint must be treated as non-existent. See *Woods v. Ryan*, No. CV 11-1085-PHX-RCB (LOA), 2011 U.S. Dist. LEXIS 101780, at *9 (D. Ariz. 2011). By extension, L3's motion to dismiss the original Complaint must also be

treated as non-existent. The result is that many of Plaintiff's new allegations lack any context or foundation. Regardless, L3 will address the First Amended Complaint as though it has superseded the original Complaint and without any reference to the prior pleadings which are to be treated as non-existent.

## III. SUMMARY OF PLAINTIFF'S ALLEGATIONS

Plaintiff alleges he was travelling through the Phoenix-Mesa Gateway Airport (IWA) on August 9, 2018, when L3 discriminated against him based on his "unpredictable and uncontrollable health emergency at his right groin." Doc. No. 15, at ¶¶ 1-5. Plaintiff describes L3 as "a United States government contractor and manufacturer of the proprietary Automatic Target Recognition ('ATR') software used in passenger screening at IWA." *Id*. at ¶ 8. The alleged discrimination stems from L3's purported status as a "Title IV organization" under Section 504 of the Rehabilitation Act of 1973 (codified at 29 U.S.C. § 794). Doc. No. 15, at ¶ 18. However, the First Amended Complaint is unclear as to the *basis* of L3's alleged discrimination.

Plaintiff's "unpredictable and uncontrollable health emergency at his right groin" was allegedly caused by a "congenital disability" which Plaintiff describes only as a "protected matter of faith between him and the Creator." *Id*. at ¶ 13. He acknowledges that L3's ATR software searched for "anomalies and threats" on his body in accordance with 49 U.S.C § 44901 and 49 C.F.R. § 1540.107. Doc. No. 15, at ¶ 16. These provisions define the terms and limitations applicable to airport passenger screening technology. Plaintiff alleges that L3 went beyond the limits prescribed by Congress and invaded his privacy when it unlawfully revealed information about his "completely human tissue congenital disorder *beneath* his skin at his right groin." (Emphasis added) *Id*. at ¶ 17. According to Plaintiff, L3's technology is unlawful because it mistakenly identified his congenital disorder as a foreign object "on the *surface* of his skin at his right groin." (Emphasis in original) *Id*. L3's alleged misidentification produced what Plaintiff describes as a "discriminatory false threat alarm" which led to a physical pat-down to resolve. This allegedly violated Plaintiff's "clearly established Constitutional rights." *Id*. at ¶ 21.

Aside from Plaintiff's vague description of his congenital disorder, his claims against L3

also are undermined by two noteworthy concessions. **First,** Plaintiff concedes that L3 was not in control of its screening software at the time of the alleged discrimination. He alleges the software is "used in a civilian setting by [the] [Transportation Security Administration ('TSA')]" and "sold commercially by L3 on the open market on six continents." *Id.* at ¶ 55. Plaintiff nonetheless maintains that L3 is "directly responsible" for the "injuries" he suffered on August 9, 2018, which he claims "could not have happened without L3's reckless actions." *Id.* at ¶¶ 47, 99. **Second,** Plaintiff concedes that he passed through L3's allegedly unlawful screening software since the date of his alleged injury without any detection of his "completely human tissue congenital disorder beneath his skin at his right groin." He states that he was at IWA on June 6, 2019, at a time when he was "not symptomatic due to his disability." *Id.* at ¶¶ 19, 99. Apparently the "false threat alarm" on August 9, 2018, was only created because Plaintiff was, "at that exact moment, uncontrollably symptomatic due to his congenital disability." *Id.* at ¶ 19.

Despite these concessions, Plaintiff claims L3 has discriminated against him such that he "can no longer exercise his statutory right to travel by air." *Id.* at ¶ 86. Plaintiff further alleges that L3 has interfered with his "personal relationship with the Creator" and "instigated creation of 'The Shadow,' a menacing presence now constantly inhabiting [Plaintiff's] waking psyche." *Id.* at ¶¶ 39-40. Plaintiff requests $250,000,000 in damages, claiming to have suffered "severe emotional distress beyond the bounds of human decency." *Id.* at Prayer for Relief, pg. 17.

**IV.   THE SAFETY ACT**

The Department of Homeland Security ("DHS") has determined that L3's screening software at issue qualifies for protections under the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 ("SAFETY Act") (6 U.S.C. § 441 *et seq.* (2018)). Congress passed the SAFETY Act in recognition of the vital role played by technology in defending against terrorist threats. Alison M. Levin, *The Safety Act of 2003: Implications for the Government Contractor Defense*, 34 PUB. CONT. L.J. 175, 176 (2004). Congress further recognized that the "Nation's product liability system threatens to keep important new technologies from the market where they could protect our citizens." *Id.* (quoting the House Select Committee on Homeland Security, H.R.

REP. NO. 107-609, at 118 (2002)). Accordingly, Congress enacted a set of liability reforms to ensure that manufacturers would not be deterred from developing critical anti-terrorism technologies. *Id*.

To become eligible for the "system of risk management" established by the SAFETY Act, the manufacturer (or "Seller") of anti-terrorism technology must first submit a "SAFETY Act Application Kit." 6 U.S.C. § 441(b) (2018); 6 CFR §§ 25.2, 25.6 (2018). There are broad non-disclosure protections for the materials submitted to the DHS during the application process—all such materials are deemed "SAFETY Act Confidential Information." 6 CFR §§ 25.2, 25.10 (2018). The liability protections available under the SAFETY Act are triggered if the Under Secretary for Science and Technology of the DHS certifies and designates the "Qualifying Anti-Terrorism Technology" ("QATT"). 6 U.S.C. § 441(b) (2018); 6 CFR § 25.3 (2018).

Here, as a result of L3's SAFETY Act Application, the DHS awarded SAFETY Act Certification and Designation to L3 for the QATT identified in the materials attached hereto as **Group Exhibit 1**. Within these materials, "Exhibit A" reflects that the QATT label applies to L3's Provision™ ATD and Provision™ 2 products which use millimeter-wave scanning technology to produce three-dimensional images. More specifically, the Provision™ ATD and Provision™ 2 products utilize "Automatic Target Detection" ("ATD") software that "analyzes scanned data and highlights threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation." Exhibit A makes it clear that the SAFTEY Act protections apply only to the Provision™ ATD and Provision™ 2 models that use the ADT software and have passed field testing by the TSA.

The materials in Group Exhibit 1 identify L-3 Communications Security and Detection Systems, Inc., and L3 Communications Corporation, as the Sellers of L3's QATT. Attached hereto as **Exhibit 2** is a Declaration from George Salimbas, formerly the Vice President of Contracts of L3 Security & Detection Systems, Inc., which is the corporate successor of L-3 Communications Security and Detection Systems, Inc. Salimbas states that: (1) L3 was formerly the parent company of L-3 Communications Security and Detection Systems, Inc., and L3 Communications

4

Corporation; (2) the SAFETY Act Certification and Designation attached hereto as Group Exhibit 1 are true and accurate copies of the authentic documents provided by the DHS Deputy Under Secretary for Science and Technology; (3) L3's Provision™ ATD and Provision™ 2 are the only models of millimeter wave scanners that L3 has sold to the TSA for airport passenger security screening at the Phoenix-Mesa Gateway Airport, and (4) at no point did L3 exercise any degree of control or authority over the QATT after it was sold to the TSA.

## V.    **APPLICABLE LEGAL STANDARDS**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient factual allegations to state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It is not enough for a plaintiff to allege a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. And while a court must generally accept a plaintiff's factual allegations as true, a court does not accept as true a plaintiff's legal conclusions that are merely couched as factual allegations. *Id*. In determining whether a complaint states a plausible claim for relief, a court must draw on its own judicial experience and common sense. *Id*. at 679.

Aside from considering the sufficiency of a plaintiff's factual allegations, a court considering a Rule 12(b)(6) motion must also consider any documents incorporated into the complaint by reference and other matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Further, a court may dismiss a claim under Rule 12(b)(6) based on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989); *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015).

## VI.   **ARGUMENT**

Plaintiff's First Amended Complaint must be dismissed for at least three reasons. **First,** L3 is entitled to a rebuttable presumption under the SAFETY Act that the government contractor defense applies. Because Plaintiff has failed to rebut this presumption, L3 is entitled to immunity under the SAFETY Act. **Second,** Plaintiff's First Amended Complaint should be dismissed based on a dispositive issue of law, because it rests on the false legal premise that Congress has

prohibited the TSA from using airport passenger screening technology capable of viewing objects beneath the surface of the skin. *See Seismic Reservoir 2020*, 785 F.3d at 335 (dismissing a claim under Rule 12(b)(6) based on the lack of an available remedy). **Third,** the Court should dismiss the First Amended Complaint because Plaintiff cannot establish the elements of his purported causes of action. The First Amended Complaint is riddled with legal conclusions that are improperly couched as factual allegations. The few proper factual allegations are inconsistent with Plaintiff's concession that L3's technology is "sold commercially" and "used in a civilian setting" by the TSA. Doc. No. 15, at ¶ 55. Because it is undisputed that the TSA was in possession of L3's allegedly unlawful technology and used said technology to conduct the allegedly unlawful security screening, Plaintiff has no basis to claim L3 intentionally caused him any harm. If anyone intentionally harmed Plaintiff, which L3 denies, it was the TSA, over which L3 has no control.

### 1. L3 is Entitled to Immunity as a Government Contractor

Plaintiff acknowledges that L3 "is a United States government contractor" and that "[a]irport checkpoint security screening is a uniquely federal interest." *Id*. at ¶¶ 8, 49. He claims, however, that L3 cannot assert derivative sovereign immunity under *Yearsley v. W. A. Ross Constr. Co.*, 309 U.S. 18 (1940), or *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988).[1] *Id*. at ¶¶ 51-56. However, the derivative sovereign immunity announced in *Yearsley* and *Boyle* is rooted in the discretionary function exception to the Federal Tort Claims Act (see *Boyle*, 487 U.S. at 511). Thus, Plaintiff has mistakenly conflated the principle of derivative sovereign immunity with the government contractor immunity codified by Congress in the SAFETY Act.

The SAFETY Act codified a rebuttable presumption that the government contractor defense may be asserted by a "Seller" of QATT. This rebuttable presumption applies against product liability lawsuits "arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies approved by the Secretary … have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the

---

[1] L3 disagrees with Plaintiff as to the applicability of *Yearsley* and *Boyle* and reserves the right to assert the defenses established in those cases.

6

Seller." 6 U.S.C. § 442(d)(1) (2018).

To establish the rebuttable presumption of the government contractor defense, the Seller of QATT must produce a Certification of a Technology as an Approved Product for Homeland Security. 6 CFR § 25.8 (2018). To overcome the presumption of dismissal, a plaintiff must show that the "Seller acted fraudulently or with willful misconduct in submitting information to the Secretary during the course of the Secretary's consideration of such technology under this subsection." 6 U.S.C. § 442(c) (2018).

Here, Plaintiff has attempted to preemptively challenge L3's SAFETY Act Certification and Designation with a series of blanket assertions that the DHS did *not* Certify or Designate L3's ATR software as QATT. Doc. No. 15, at ¶¶ 58, 79, 83. Because Plaintiff has failed to provide any context or foundation for these allegations, L3 can only speculate that he is attempting to create a distinction between "Automatic Target **Recognition** software" and the "Automatic Target **Detection** software" referenced in Group Exhibit 1. If this is indeed the basis for Plaintiff's allegations, then he is addressing a distinction without a difference. The ATD software utilized in the Provision™ ATD and Provision™ 2 products is a form of "Automatic Target Recognition software" as the term is defined in the relevant statutes. See 49 U.S.C § 44901(l)(1)(A)(i) and 49 C.F.R. § 1540.107(d)(1)(i). In essence, "Automatic Target Recognition" means the same thing as "Automatic Target Detection." See Salimbas Declaration, Exhibit 2.

Admittedly, no case has determined whether the presumption of a government contractor defense under the SAFETY Act applies to a particular Seller of QATT. It could be argued that the incident itself described in the First Amended Complaint does not arise from an act of terrorism, but there is no question that L3's QATT was deployed in defense against or response to or recovery from such an act. It is noteworthy that the SAFETY Act defines QATT as:

> "any product, equipment, service (including support services), device, or technology (including information technology) designed, developed, modified, or procured **for the specific purpose of preventing, detecting, identifying, or deterring acts of terrorism or limiting the harm such acts might otherwise cause**, that is designated as such by the Secretary." (Emphasis added.) 6 U.S.C. § 444 (2018).

The technology contained in the L3 products targeted by Plaintiff evolved as a direct result of the terrorist attacks of 9/11. The security needs at commercial airports became significantly more complex following those attacks. There is no question that Plaintiff's lawsuit arises out of or relates to the performance of L3's QATT for the specific purpose of preventing, detecting, identifying, or deterring acts of terrorism or limiting the harm such acts might otherwise cause.

Further, while the SAFETY Act Certification and Designation were signed on October 26, 2016, the Terms and Conditions for both documents state that they apply retroactively to all sales of the QATT going back to July 1, 2004. (See "Earliest Date of Sale" within the "Terms and Conditions.") This means the TSA had been utilizing L3's QATT to identify and prevent acts of terror for more than 14 years at the time of Plaintiff's trip through the Phoenix-Mesa Gateway Airport on August 9, 2018.

"It is hard to overestimate the need to search air travelers for weapons and explosives before they are allowed to board the aircraft. As illustrated over the last three decades, the potential damage and destruction from air terrorism is horrifically enormous." *United States v. Marquez*, 410 F.3d 612, 618 (9th Cir. 2005). To hold L3 liable for damages after all these years on the basis that its QATT invaded a passenger's privacy would not only deal a tremendous blow to our Nation's anti-terrorism defense apparatus, but it would also render the SAFETY Act virtually meaningless.

For these reasons, the Court should hold that L3's QATT is entitled to a rebuttable presumption of a government contractor defense under 6 U.S.C. § 442(d)(1) (2018). Because Plaintiff has not alleged that L3 acted fraudulently in submitting information to the DHS in its application for SAFETY Act protections (see 6 U.S.C. § 442(c) (2018)), and because no set of facts exists under which Plaintiff can prove the same, the Court should dismiss Plaintiff's Complaint under Rule 12(b)(6).

**2.**      **L3's QATT is Not "Unlawful"**

The gravamen of Plaintiff's First Amended Complaint is that L3's airport security screening software "unlawfully" revealed information about his "completely human tissue

congenital disorder beneath his skin at his right groin." Doc. No. 15, at ¶¶ 17, 21. He posits that "passenger searches are limited by Congress to the surface of the skin." *Id*. at ¶ 20. Because Plaintiff is wrong about the congressional limits placed on the capabilities of airport passenger screening technology, his claims are each rendered meritless.

Plaintiff correctly identifies but mistakenly interprets 49 U.S.C. § 44901(l) and 49 C.F.R. § 1540.107(d), which provide the same definitions for terms applicable to the standards for airport passenger screening technology. *Id*. at ¶ 16. The TSA is authorized to use screening technology "which may include the use of *advanced imaging technology*." (Emphasis added) 49 CFR 1540.107(d). If the TSA elects to use "advanced imaging technology," then it must ensure the use of ATR software. *Id*.

"**Advanced Imaging Technology**" means "a device used in the screening of passengers that creates a visual image of an individual showing the surface of the skin and revealing other objects on the body." 49 U.S.C § 44901(l)(1)(A) (2018); 49 CFR § 1540.107(d)(1) (2018). This "may include devices using backscatter x-rays or millimeter waves and devices referred to as whole-body imaging technology or body scanning machines." *Id*.

"**Automatic Target Recognition software**" means "software installed on an advanced imaging technology that produces a generic image of the individual being screened that is the same as the images produced for all other screened individuals." 49 U.S.C § 44901(l)(1)(C) (2018); 49 CFR § 1540.107(d)(2) (2018).

As seen above, Plaintiff's contention that L3's screening software is "unlawful" is improperly drawn from the definition of "Advanced Imaging Technology." The first part of the definition references "a visual image of an individual showing the surface of the skin and revealing other objects *on the body*." However, Plaintiff ignores the second part of the definition, which provides that "Advanced Imaging Technology" may include devices "using backscatter x-rays or millimeter waves and devices referred to as whole-body imaging technology or body scanning machines." In addition to revealing objects "on the body," backscatter x-rays can reveal matter "underneath and near the surface of the skin," such as medical implants. U.S. Dep't of Homeland

Sec., *Privacy Impact Assessment Update for TSA Advanced Imaging Technology*, 3 (Jan. 25, 2011), available at http://www.dhs.gov/xlibrary/assets/privacy/privacy-pia-tsa-ait.pdf. Millimeter wave technology generates images based on the energy reflected from the body. *Id*. These technologies are used to detect anomalies appearing on an image of a generic figure. *Id*. at 6. This is consistent with the DHS Certification and Designation of L3's QATT, which is designed to highlight "threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation."

Moreover, nothing in the definition of ATR software requires an ability to distinguish between objects located on the skin and objects located underneath the surface of the skin. Rather, ATR software simply "produces a generic image of the individual being screened that is the same as the images produced for all other screened individuals." 49 U.S.C § 44901(l)(1)(C) (2018); 49 CFR § 1540.107(d)(2) (2018). Thus, contrary to Plaintiff's allegations, there is nothing "unlawful" about screening software which is capable of detecting objects underneath the surface of the skin.

In short, Plaintiff has alleged that L3's airport security screening software performed precisely to the standards and specifications set out by Congress and the DHS. Because Plaintiff's entire First Amended Complaint rests on his false contention that L3's screening software unlawfully detected an object beneath his skin, it should be dismissed under Rule 12(b)(6) based on a dispositive issue of law.

### 3.     **Plaintiff Cannot State The Elements For Any of His Purported Causes of Action.**

In addition to the arguments advanced above, Plaintiff's First Amended Complaint should also be dismissed for his failure to state a proper claim against L3. His claim of discrimination is flawed in several respects, not the least of which is his failure to allege that he received any unequal treatment as compared to other people in similar circumstances. His remaining claims fail for the simple reason that L3's technology is "sold commercially" and "used in a civilian setting by [the] Transportation Security Administration." Doc. No. 15, at ¶ 55. By extension, it is undisputed that the TSA possessed and operated L3's QATT at the Phoenix-Mesa Gateway Airport on August 9, 2018. Moreover, the Salimbas affidavit establishes that L3 did not exercise

any degree of control or authority over the QATT after it was sold to the TSA. See Exhibit 2. Hence, it is unavoidable that the TSA conducted the purportedly unconstitutional "search" which revealed Plaintiff's unknown congenital disability. Plaintiff attempts to skirt this issue by arguing that L3 is "directly responsible" for the "injuries" he suffered on August 9, 2018, which he claims "could not have happened without L3's reckless actions." *Id*. at ¶¶ 47, 99. This argument has no merit, because Plaintiff's purported causes of action require specific intent.

### Count I: "United States Code – Rehabilitation Act of 1973 Section 504"

Section 504 of the Rehabilitation Act of 1973 provides, "[n]o otherwise qualified individual **with a disability** . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under **any program or activity receiving Federal financial assistance**… ." (Emphasis added) 29 U.S.C. § 794(a).

To qualify as being "disabled" under Section 504, one must show: (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such impairment; or (3) be regarded as having such impairment. *Marquez v. Glendale Union High School District*, 2018 U.S. Dist. LEXIS 173343, at *42 (D. Ariz. Oct. 9, 2018).

Here, Plaintiff has made no attempt to show a record of a qualifying impairment or that he is regarded as having such an impairment. Instead, he vaguely alleges the existence of congenital disability that is a "protected matter of faith between him and the Creator." Doc. No. 15, at ¶ 13. Regarding limitations on major life activities, Plaintiff alleges only that he can "no longer exercise his right to travel between the several states by air." Doc. No. 15, at ¶ 42. But this allegation is belied by his admission that he passed through L3's allegedly unlawful screening technology since the date of his alleged injury without incident on June 6, 2019, at a time when he was "not symptomatic due to his disability." *Id*. at ¶¶ 19, 99. For these reasons, Plaintiff has failed to show the existence of a qualifying disability under Section 504.

Plaintiff has also failed to establish that L3 is a "program or activity" subject to a cause of action under Section 504. The statute defines a "program or activity" in the context of government agencies, academic institutions, and corporations. Relevant here, there are two ways an "entire

11

corporation" can be considered a "program or activity" under Section 504: (1) if Federal financial assistance is extended to such corporation "as a whole;" or (2) if the entire corporation is "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation. 29 U.S.C. § 794(b)(3)(A); *Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940 (9th Cir. 2009); *see also Haybarger v. Lawrence County Adult Prob. & Parole*, 551 F.3d 193, 199 (3d Cir. 2008) (narrowly construing "program or activity" to reach "only the specific parts of a recipient's operation which directly benefited from federal assistance").

Here, Plaintiff alleges that L3's "commercial aviation division" includes an "Airline Academy" that is "in direct receipt" of federal financial assistance under "U.S. Department of Education Title IV" and summarily concludes that L3 is a "Title IV organization." Doc. No. 15, at ¶¶ 24-25. Plaintiff next claims that L3 "violated the Rehabilitation Act of 1973 Section 504 when it discriminated against [him] solely because of his disability at IWA on August 9, 2018 when its proprietary ATR software unlawfully invaded his privacy solely because of his congenital disability and set off a chain of unstoppable events that interfered with his personal liberty and caused him unnecessary, severe and lasting harm." *Id*. at ¶ 29.

By alleging that an "Academy" within a "division" of L3 is "in direct receipt" of federal financial assistance, Plaintiff has done nothing to establish that L3 received federal financial assistance **as a whole.** Further, the Salimbas affidavit establishes that L3 did not, in fact, receive federal financial assistance as a whole. *See* Exhibit. 2. Salimbas also attests that L3 was never principally engaged in the business of providing education, health care, housing, social services, or parks and recreation. *Id*. Plaintiff fails to state a discrimination claim for these reasons alone.

Finally, it is evident that Plaintiff misunderstands the concept of discrimination from a legal standpoint. "Discrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (quoting *Attorney General v. Irish People, Inc.,* 684 F.2d 928, 946 (D.C. Cir. 1982). "The goal of identifying a similarly situated class . . . is to isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group." *United*

*States v. Aguilar,* 883 F.2d 662, 706 (9th Cir. 1989).

Here, Plaintiff has not alleged how he was treated unequally as compared to other people in similar circumstances. To prove his claim at the most basic level, he would need to show that other people with similar "congenital disabilities" received favorable treatment and Plaintiff was singled out for unfavorable treatment. Just because L3's screening software detected an anomaly at Plaintiff's right groin does not mean he was discriminated against. In fact, one advantage of L3's software is that it does *not* discriminate—it detects anomalies on generic images regardless of race, color, gender, or disability. That it may have detected an anomaly on a generic image when Plaintiff passed through security does not give rise to a claim for discrimination.

### Count II: "Arizona – A.R.S. § 47-2318 – Third Party Beneficiaries of Warranties Express or Implied"

Section 47-2318 of the Arizona Revised Statutes states: "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is in injured in person by breach of warranty. A seller may not exclude or limit the operation of this section."

Plaintiff strains to place himself within the ambit of this provision. He alleges that that: (1) the DHS is the "buyer" of L3's screening software; (2) the DHS's "home" is the IWA security checkpoint; and (3) Plaintiff was a "guest" in the DHS's home. Doc. No. 15, at ¶ 44. This argument lacks any merit. Plaintiff has done nothing more than state improper legal conclusions couched as factual allegations. See *Ashcroft*, 556 U.S. at 678. He was not a "guest" in anyone's "home." He was a "ticketed passenger" in an airport. Doc. No. 15, at ¶ 44. The provision is simply not applicable. Even if it was, for the reasons stated above, L3's screening software worked as designed, and L3 breached no warranties to the DHS, TSA, or any other "buyer."

### Count III: "Arizona – Common Law Intentional Infliction of Emotional Distress"

To state a common law claim for intentional infliction of emotional distress, Plaintiff must show that: (1) L3's conduct was extreme and outrageous; (2) L3 intended to cause emotional

distress or recklessly disregarded the near certainty that distress would result from its conduct; and (3) severe emotional distress did indeed occur as a result of L3's conduct. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987).

Here, Plaintiff cannot plausibly claim that L3's conduct was extreme and outrageous or intended in any way to cause emotional distress. *See Marquez*, 410 F.3d at 618 (holding that the TSA's challenged screening procedures were reasonable and "geared towards detection and deterrence of airborne terrorism"). Further, given Plaintiff's admissions that the TSA possesses L3's disputed software and he can pass through the software without incident, he cannot reasonably claim that L3 acted with any specific intent or disregarded any near certainties with respect to his purported congenital disability.

**Count IV: "Arizona – Common Law Product Liability Manufacturing Defect"**

To establish a *prima facie* case for strict product liability, Plaintiff must show that: (1) the product was defective in condition when it left the hands of L3; (2) the defect made the product unreasonably dangerous; and (3) the defect was a proximate cause of Plaintiff's injuries. *See Sw. Pet Prod., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1051 (D. Ariz. 2003) (citing *Jimenez v. Sears, Roebuck and Co.*, 183 Ariz. 399, 904 P.2d 861 (1995)). A defectively manufactured product is flawed because of mistakes during the manufacturing process. *Gomulka v. Yavapai Mach. & Auto Parts, Inc.*, 155 Ariz. 239, 241-42 (Ct. App. 1987).

Here, Plaintiff attempts to establish these elements with direct references to L3's motion to dismiss his original Complaint, which must be treated as non-existent. Doc. No. 15, at ¶ 73. He goes on to allege: "L3's proprietary ATR software was defective in condition when it left the hands of L3 because it failed to achieve the most basic, legally-mandated function of distinguishing between human tissue and foreign objects, and between human tissue beneath [Plaintiff's] skin and foreign objects on the *surface* of his skin." (Emphasis in original) *Id*. at ¶ 76.

Plaintiff's argument again completely misses the mark. As shown above, there is no requirement that airport passenger screening technology must be capable of distinguishing foreign objects on the surface of the skin from natural objects immediately beneath the surface of the skin.

Because L3's screening software satisfied the standards and criteria for SAFETY Act Certification and Designation, and because nothing about L3's QATT is "unlawful," Plaintiff has no basis to claim that L3's screening software was defective or unreasonably dangerous.

### Count V: "Arizona – Common Law Product Liability Information Defect"

To state a product liability claim based on an information defect, Plaintiff must show that: (1) L3 had a duty to warn of the product's dangerous propensities; and (2) the lack of adequate warning made the product defective and unreasonably dangerous. *Golonka v. General Motors Corp.*, 204 Ariz. 575, 588 (Ariz. Ct. App. 2003).

Here, Plaintiff attempts to support his cause of action by quoting the Ninth Circuit Court of Appeals in *Whisnant v. United States,* 400 F.3d 1177, 1181 (9th Cir.2005), noting: " 'matters of scientific and professional judgment, particularly judgments concerning safety, are rarely considered to be susceptible to social, economic, or political policy.' "

L3 could not agree more. It is perplexing that Plaintiff would cite this case in *support* of his claims given his premise that the TSA should not have used the software purchased from L3 to detect an anomaly on a generic figure or conducted the resulting pat-down. For all of the reasons discussed above, and because the DHS and TSA have broad discretion to make scientific and professional judgments concerning safety matters, Plaintiff has no basis to claim that L3's screening software was defective and unreasonably dangerous.

### Count VI: "Arizona – Common Law Intrusion Upon Seclusion"

To state a claim for intrusion upon seclusion, Plaintiff must allege that L3 committed: (1) an intentional intrusion; (2) upon his private affairs; (3) that would be considered highly offensive to a reasonable person. *See Shepard v. Costco Wholesale Corporation*, 246 Ariz. 470, 476 (Ariz. Ct. App. 2019).

Here, Plaintiff's vague description of his purported disability renders him unable to show any violation that would be considered highly offensive to a reasonable person. It is not enough for Plaintiff to simply allege that his unknown congenital disability is a "protected matter of faith between him and the Creator." Doc. No. 15, at ¶ 13. Without more, there is no way of telling

whether what happened to Plaintiff would be considered highly offensive to a reasonable person. Regardless, for the reasons discussed above, Plaintiff cannot plausibly claim that L3 *intentionally* intruded upon his private affairs. If anyone acted with such intentions, it was the TSA. For these reasons, Plaintiff has failed to state a claim for intrusion upon seclusion.

### Count VII: "Arizona – Common Law False Imprisonment"

To state a common law claim for false imprisonment, Plaintiff must show that L3: (1) acted with intent to confine him within boundaries fixed by L3; (2) L3's actions resulted in such confinement, either directly or indirectly; and (3) Plaintiff was conscious of the confinement or was harmed by it. See *Hart v. Seven Resorts Inc*., 190 Ariz. 272, 281 (Ariz. Ct. App. 1997).

Here, even if Plaintiff can show that L3's actions indirectly resulted in his confinement, he has no basis to claim that L3 acted with the specific intent to confine him within boundaries fixed by L3. If Plaintiff was confined within any boundaries, they were fixed by the TSA, DHS, or some other authority. Plaintiff's claim against L3 has absolutely no merit and must be dismissed.

### Injunctive Relief

Finally, Plaintiff seeks injunctive relief requiring L3 to "stop discriminating against [him] based solely because of his disability" and "stop denying [him] his right to travel by air." Doc. No. 15, at pg. 17. However, to be entitled to injunctive relief, Plaintiff must show that: (1) he has a strong likelihood of success on merits; (2) he will suffer irreparable injury if the relief is not granted; (3) a balance of hardships favors Plaintiff; and (4) public policy favors an injunction. *See Shoen v. Shoen*, 167 Ariz. 58, 63, 804 P.2d 787, 792 (App. 1990). Because Plaintiff has made none of the requisite showings, and for all of the reasons discussed above, the Court should dismiss Plaintiff's claims for injunctive relief.

## VII. CONCLUSION

Before concluding, L3 notes that Plaintiff could have easily avoided the injuries he allegedly suffered at the Phoenix-Mesa Gateway Airport on August 9, 2018. He could have opted for a pat-down that would have been conducted privately by an officer of the same sex. *See Electronic Privacy Information Center v. United States Department of Homeland Security*, 653

1  F.3d 1, 3 (2011). This would have allowed Plaintiff to explain his condition in a safe space and alleviate his potential embarrassment to the greatest extent possible. Assuming the anomaly detected by the TSA officials was indeed Plaintiff's naturally occurring health condition, the TSA officials had no way of knowing that at the time. The anomaly could just as easily have been a concealed device which posed a safety threat. Requiring L3's screening software to perform as Plaintiff's suggests would be to impose an impractical burden that would weaken our Nation's national security apparatus. That is why, contrary to Plaintiff's contention, Congress has imposed no such burden.

WHEREFORE, for the foregoing reasons, Defendant, L3HARRIS TECHNOLOGIES, INC., respectfully requests that this Court dismiss Plaintiff's First Amended Complaint in its entirety with prejudice, and for such further relief as the Court may deem just.

**RESPECTFULLY SUBMITTED** this 5th day of June, 2020.

                                **SANDERS & PARKS, P.C.**

By   */s/ Ryan P. Sandstrom*
      Mark G. Worischeck
      Ryan P. Sandstrom
      3030 North Third Street, Suite 1300
      Phoenix, AZ  85012-3099

      Michael G. McQuillen (admitted *pro hac vice*)
      Christopher J. Raistrick (admitted *pro hac vice*)
      Mark S. Susina (admitted *pro hac vice*)
      Richard C. Harris (admitted *pro hac vice*)
      **ADLER MURPHY & McQUILLEN, LLP**
      20 S. Clark St., Suite 2500
      Chicago, Illinois 60603
      *Attorneys for Defendant L3Harris Technologies, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.

With a copy sent via U.S. Mail and email to:

Michael Gibson Muir
19 Inglewood Ln
Bloomington, IL 61704
blaxwan@yahoo.com
*Plaintiff Pro Per*

By:____*Katie Martin*_____

18